UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHIBUIKE IGWENAGU and BRANDON HASTINGS, on behalf of themselves and all others similarly situated, v. BIMBO BAKERIES USA, INC. and BIMBO FOODS BAKERIES DISTRIBUTION, LLC Defendant. | Civil Action No. 4:25-40063-MRG |

## ORDER AND REPORT AND RECOMMENDATION

**March 16, 2026**

**Hennessy, M.J.**

This case is before the Court on Defendants' Motion to Compel Arbitration and Stay

Proceedings or, in the Alternative, to Dismiss Counts III-IV for failure to state a claim pursuant

to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* and Federal Rule of Civil Procedure 12(b)(6).

[Dkt. No. 14].  Plaintiffs have filed an opposition to this Motion, [Dkt. No. 18], and Defendants

have filed a reply.  [Dkt. No. 21].  Defendants' Motion was referred to me on December 8, 2025,

pursuant to 28 U.S.C. § 636(b)(1)(A).  [Dkt. No. 22].  For the reasons stated herein, Defendants'

Motion to Compel Arbitration and Stay Proceedings is denied, and I recommend that

Defendants' Motion to Dismiss be denied in its entirety.

Plaintiffs Chibuike Igwenagu and Brandon Hastings are entrepreneurs and delivery

drivers who, either individually (Hastings) or through a business entity (Igwenagu), purchase and

deliver bakery products from Defendants Bimbo Bakeries USA, Inc. ("Bimbo Bakeries") and

1

Bimbo Food Bakeries Distribution, LLC ("Bimbo Distribution").  [Dkt. No. 1 at pp. 3, 5].

Bimbo Bakeries is a Pennsylvania corporation that produces bakery products distributed

throughout Massachusetts and neighboring states.  [Dkt. No. 1 at pp. 3, 5].  Bimbo Distribution is

a corporate entity headquartered in Pennsylvania that, alongside Bimbo Bakeries, "handle[s]

delivery operations of Bimbo products and maintains substantial and continuous business

operations in Massachusetts[.]"  Id. at 4.

Plaintiffs' claims under the Massachusetts Wage Act (Count III) and for unjust

enrichment (Count IV) arise out of Defendants' alleged misclassification of Plaintiffs as

independent contractors rather than employees, and Defendants' resulting failure to properly

compensate Plaintiffs.  [Dkt. No. 1 at pp. 13-16]; [Dkt. No. 14].  On July 7, 2025, Defendants

moved to compel arbitration pursuant to the arbitration agreement that Hastings signed in a

previous settlement agreement and that Igwenagu signed in the distributor agreement.  [Dkt. No.

15 at pp. 5-11].    Plaintiffs filed an opposition to Defendants' motion, in which they argue that

Plaintiffs cannot be compelled to arbitrate because contracts for employment of transportation

workers are excluded from the Federal Arbitration Act ("FAA").  See [Dkt. No. 18].

I.    **FACTUAL BACKGROUND**

In August 2007, Hastings entered into a distribution agreement with Bimbo Distribution's

predecessor, George Weston Bakeries Distribution, Inc, ("GWBD").  See [Dkt. No. 15 at p. 9];

see also [Dkt. No. 15.1, Exh. B].  In November 2019, Igwenagu, as authorized representative and

guarantor of his business, Cee Distribution, entered into a distribution agreement with Bimbo

Distribution.  [Dkt. No. 15 at p. 9]; [Dkt. No. 15.1, Exh. A].  The distribution agreements signed

by both Hastings and Igwenagu "provided [distributors] with the exclusive right to purchase and

resell bakery products at a profit within a particular distribution area, so long as the Distributors

agreed to maintain certain standards for the sale and distribution of the products." [Dkt. No. 15 at p. 9]; see also [Dkt. No. 15.1, Exh. A at Art. 4-5, Exh. B at Art. 3].  The distribution agreements specify Plaintiffs' delivery routes and schedules, delivery windows, time constraints, and areas in which distributors could distribute.  [Dkt. No. 15 at p. 9]; see also [Dkt. No. 15.1, Exh. A at Art. 4-5, Exh. B at Art. 1, 3].  However, both distribution agreements left Hastings and Igwenagu free to engage persons to carry out their obligations under the agreements and to manage and compensate those people accordingly as long as they ensured that those they engaged complied with the terms of their distribution agreements with Bimbo.  [Dkt. No. 15 at p. 9]; see also [Dkt. No. 15, Exh. A at § 6.6, Exh. B at § 4.3].  Accordingly, the distribution agreements defined Hastings[1] and Igwenagu[2] as independent contractors.  [Dkt. No. 15.1, Exh. A at § 2.2, Exh. B at § 2.3].

---

[1] The distribution agreement between Bimbo Food Bakeries Distribution and Hastings states:

> The parties intend to create an independent contractor relationship and it is of the essence of this Agreement that DISTRIBUTOR is an independent contractor for all purposes and DISTRIBUTOR shall only identify himself as such in all third party dealings. Any contrary final determination by any board, tribunal or court of competent jurisdiction shall require the amendment of this Agreement in any way necessary to establish an independent contractor relationship. As an independent contractor, DISTRIBUTOR has the right to operate the business as DISTRIBUTOR chooses, and shall bear all risks and costs of operating such business. DISTRIBUTOR has no authority to retain any person on behalf of GWBD. It is expressly understood that DISTRIBUTOR has no claim, or right under any circumstances, to any benefits or other compensation currently paid by GWBD to employees, or hereafter declared by GWBD for the benefit of employees. No fiduciary relationship exists between the parties.

[Dkt. No. 15, Exh. B at § 2.3].

[2] The distributor agreement between Bimbo Food Bakeries Distribution and Igwenagu states:

> DISTRIBUTOR and BAKERY intend to create an independent contractor relationship for all purposes. It is the essence of this Agreement that DISTRIBUTOR and Guarantor, and their employees and contractors, if any, be independent contractors for all purposes and only identify itself and his or her self [sic] as such in all third party dealings. The parties do not intend to enter into an employment, joint venture, partnership or other similar relationship in any way. Any contrary final determination by any legal authority including a board, tribunal, agency, arbitrator or court of competent jurisdiction shall require the amendment of this Agreement in any way necessary to establish an independent contractor relationship. As an independent contractor, DISTRIBUTOR has the right to operate its business using DISTRIBUTOR's own judgment and discretion to determine the methods to be used to achieve the results required by this Agreement and shall bear all risks and costs of operating such business. DISTRIBUTOR has no authority to retain any person on behalf of BAKERY. It is expressly acknowledged and agreed that DISTRIBUTOR and GUARANTOR, and their employees and/or contractors, if any, have no claim or right under any circumstances to any benefits or compensation currently or at any time paid by BAKERY and its affiliates to employees

3

The distribution agreement executed between Bimbo Distribution and Igwenagu contains an arbitration clause.  [Dkt. No. 15.1, Exh. A at Art. 13].  That clause requires "Covered Disputes…relating to any assertion of any employment relationship" with Defendants be sent to "mandatory binding arbitration."  Id. at §§ 13.3, 13.6.  The agreement defines "Covered Disputes" as "any and all Disputes between DISTRIBUTOR and COMPANY, including claims arising out of… any assertion of any employment relationship between DISTRIBUTOR and BAKERY…" Id. at § 13.6.

The distribution agreement executed between GWBD and Hastings does not contain an arbitration clause; however, a later executed settlement agreement[3] between Hastings and Defendants does.  See [Dkt. No. 15.1 at Exh. B, Exh. C at Exh. A].  The settlement agreement requires all "Covered Disputes" to be sent to "mandatory binding arbitration[,]" and defines "covered disputes" as any and all disputes between the distributor and Defendants, "… including claims arising out of or in any way relating to… any assertion of any employment relationship between DISTRIBUTOR…and COMPANY…" [Dkt. No. 15.1, Exh. C at Exh. A §§ 13.3, 13.6]. As consideration for his agreement to amend his current distribution agreement to incorporate a Mandatory Dispute Resolution Agreement (MDRA), Hastings received an additional $1,000 payment on top of his settlement payment.  [Dkt. No. 15.1, Exh. C at § 2(c)].

---

or hereafter declared by BAKERY or its affiliates for the benefit of their employees. It is also expressly acknowledged and agreed that this Agreement and/or the relationship between BAKERY and DISTRIBUTOR creates no right to salary, wages or commissions of any kind and, therefore, any charges authorized by this Agreement or expenses incurred by DISTRIBUTOR in connection with its business or this Agreement do not constitute deductions from wages or other compensation. Except as expressly provided in this Agreement, no fiduciary relationship exists between the parties. [Dkt. No. 15, Exh. A at §2.2].

[3] In 2018, Hastings opted into a similar misclassification class action against Defendants in New Hampshire.  [Dkt. No. 15 at 5] (citing Camp v. Bimbo Bakeries USA, No. 1:18-cv-003768-SM (D.N.H.), ECF 1)).  In 2020, Hastings decided to settle his claims against Defendants, and the settlement agreement (which contains an arbitration clause) was approved by an arbitrator. Id.

## II.    ENFORCEABILITY OF ARBITRATION AGREEMENTS UNDER THE FAA

The FAA establishes a "liberal federal policy favoring arbitration agreements[,]" and requires courts to "rigorously" "enforce arbitration agreements according to their terms[.]" Epic Systems Corporation v. Lewis, 584 U.S. 497, 505-6 (2018) (quoting Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) and American Express Co. v. Italian Colors Restaurant, 570 U.S. 228, 233 (2013)).  The Act states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Moreover, Congress has sought to place arbitration agreements "upon the same footing as contracts," to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate."  Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219-20 (1985) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess., 1-2 (1924)).  The FAA applies to "contract[s] evidencing a transaction involving [interstate] commerce[.]"  Dialysis Access Ctr. LLC v. RMS Lifeline Inc., 932 F.3d 1, 7 (1st Cir. 2019); see 9 U.S.C § 2.  The Supreme Court has construed the term "involving commerce" used in 9 U.S.C. § 2 as invoking the broadest permissible exercise of Congress' Commerce Clause power."  Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003).

"The party that seeks to compel arbitration is the one that bears the burden of proving that a valid agreement to arbitrate exists, the movant has a right to enforce it, the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement."  Canales v. Lepage Bakeries Park Street LLC, 596 F. Supp. 3d 261, 265-66 (D. Mass. 2022) (internal quotations omitted); Dialysis Access Ctr., 638 F.3d at 375 (stating that the party seeking to compel arbitration must demonstrate these four elements).  When determining whether a valid arbitration agreement exists, courts apply state contract law.  Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 174 (1st Cir. 2021).  The Supreme Court has held "state law,

5

whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity of, revocability, and enforceability of contracts generally." Perry v. Thomas, 482 U.S. 483, 492 n. 9 (1987) (emphasis original). "When deciding whether the parties agreed to arbitrate a certain matter … courts generally … should apply ordinary state-law principles that govern formation of contracts." First Options of Chi. Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

Where a defendant moves to compel arbitration pursuant to the FAA, the summary judgment standard applies to evaluating the motion. Crean v. Morgan Stanley Smith Barney, LLC, 652 F. Supp. 3d 171, 175 (D. Mass. 2023) (citing Air-Con, 21 F.4th at 174). "Pursuant to the summary judgment standard, the court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. If the non-moving party puts forward materials that create a genuine issue of fact about a dispute's arbitrability, the district court shall proceed summarily to trial to resolve that question." Air-Con, 21 F.4th at 175 (internal citations omitted). "In short, 'if the party moving to compel arbitration meets its initial burden of production, the non-moving party must offer evidence supporting its own case' and 'cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitrate rests.'" Crean, (quoting Casale v. Ecolab Inc., No. 2:21-cv-00126-NT, 2022 WL 19101126, at *4 (D. Me. June 3, 2022)). Here, Defendants have successfully established that both Plaintiffs signed arbitration clauses. [Dkt. No. 15.1, Exh. A at § 13.3, 13.6, Exh. C. at Exh. A].

However, 9 U.S.C. § 1 provides an exemption from the FAA which states that the statute does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. "If…the parties did not agree

to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently." First Options of Chi., 514 U.S. at 943.  Here, the parties are silent as to whether a court or arbitrator should decide the arbitrability question.  [Dkt. No. 15.1, Exh. A, § 13]; [Dkt. No. 15.1, Exh. C, § 13].  Thus, it falls to this Court to decide whether Plaintiffs qualify as transportation workers under § 1.

### A.  Scope of the § 1 Exemption

Section 1 of the FAA states that the statute does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; see Waithaka v. Amazon.com, Inc., 966 F.3d 10, 26 (1st Cir. 2020), cert. denied, —— U.S. ——, 141 S. Ct. 2794, 210 L.Ed.2d 928 (2021), reh'g denied, —— U.S. ——, 141 S. Ct. 2886, 210 L.Ed.2d 1001 (2021).

In New Prime Inc v. Oliveira, the Supreme Court held that the phrase "contract of employment" in Section 1 of the FAA refers broadly to agreements to perform work and is not limited to formal employer-employee relationships.  586 U.S. 105, 106 (2019).  The Court clarified that independent contractors may still fall within the scope of a "contract of employment" if the agreement requires them to perform work or services.  See id.  A court "should decide for itself whether § 1's 'contract of employment' exclusion applies before ordering arbitration." Id. at 108.

With respect to the residual exclusion of "any other class of workers engaged in foreign or interstate commerce" in Section 1 of the FAA, the Supreme Court held in Circuit City Stores, Inc. v. Adams that it refers to transportation workers.  532 U.S. 105, 119, 121-22 (2001) ("Section 1 exempts from the FAA only contracts of employment of transportation workers.").

Although the Supreme Court has provided little guidance on how courts should define "transportation worker," the First Circuit held in Waithaka that "last-mile delivery workers who haul goods on the final legs of interstate journeys" "are transportation workers 'engaged in ... interstate commerce.'" Canales, 596 F. Supp. 3d at 266 (quoting Waithaka, 966 F.3d at 26)). Delivery drivers are transportation workers "regardless of whether the workers themselves cross state lines" because they work in "transporting goods or people 'within the flow of interstate commerce.'" Waithaka, 966 F.3d at 26. The First Circuit adopted the Third Circuit's reasoning that transportation workers are those "who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." Id. at 20 n. 9 (quoting Tenney Engineering, Inc. v. United Elec. Radio & Mach. Workers of America, (U.E.) Local 437, 207 F.2d 450, (3d Cir. 1953)).

The First Circuit has since recognized three categories of workers who engage in interstate commerce: (1) "workers who themselves carried goods across state lines[,]" (2) workers "who transported goods or passengers that were moving interstate[,]" and (3) workers who were so closely related to interstate transportation, that they were "practically a part of it." Fraga v. Premium Retail Services, Inc., 61 F.4th 228, 237 (1st Cir. 2023) (quoting Waithaka, 966 F.3d at 20 (internal citation omitted)). Relatedly, one need not work for a transportation company to be a "transportation worker." Saxon, 993 F.3d 492, 497 (7th Cir. 2021); see also Fraga, 583 F. Supp. 3d at 285 ("It is not required that a class of workers be employed by an interstate transportation business nor a business of a certain geographic scope to fall within Section 1." (internal quotation marks and citations omitted)). As the party seeking to avoid arbitration, Plaintiffs bear the burden of proving that this exemption applies. Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000).

### B. Applicability to this Case

Having determined the scope of § 1, this Court next applies it to the facts of this case and concludes that Plaintiffs fall under the exemption; therefore, Plaintiffs cannot be compelled to arbitrate their claims pursuant to the FAA.

> 1. The distribution agreements signed by Plaintiffs were "contracts of employment" for transportation workers.

Plaintiffs contend that they cannot be compelled to arbitrate because the arbitration clauses they signed are contained in "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce[]" which are exempt from the FAA under § 1. [Dkt. No. 18 at p. 1]. Defendants argue to the contrary that Plaintiffs are not covered by § 1's exemption because the distribution agreements signed between Plaintiffs and Defendants were commercial contracts rather than contracts for employment which are exempt under § 1.[4] [Dkt. No. 15 at p. 10].

---

[4]    With respect to Hastings' arbitration clause in particular, Defendants argue that, because it was included in a subsequent settlement agreement and not as part of Hastings' original distribution agreement, that it cannot be considered part of a "contract for employment" and therefore exempt under § 1. [Dkt. No. 15 at pp. 5-6]. Specifically, Defendants claim that the term "contract of employment" used in § 1 has been narrowly construed to apply to only contracts "for the performance of work by workers." Id. at 6 (citing New Prime, 586 U.S. at 116). This argument flies in the face of both the terms of the settlement agreement signed between Hastings and Defendants and basic contract law. The settlement agreement specifically states

> [t]his Agreement and any Exhibit(s) hereto, constitutes the entire agreement of the Parties, and supersedes all prior understandings, whether oral or written, between them, pertaining to the released claims described in Paragraphs 4 and 5 above but does not modify the Distribution Agreement except with regard to any amendment of the Distribution Agreement to include a Mandatory Dispute Resolution Agreement as may be set forth herein, if applicable[,]

thereby carving out the Mandatory Dispute Resolution Agreement as the one aspect of the settlement agreement that is to be construed as an amendment to the underlying distribution contract. [Dkt. No. 15.1, Exh. C at § 17].

"A settlement agreement is a contract, and its enforceability is determined by applying general contract law." Sparrow v. Demonico, 461 Mass. 322, 328 (2012). In Massachusetts, a contract is formed when there is "reasonable notice of the terms and a reasonable manifestation of assent to those terms." Archer v. Grubhub, Inc., 490 Mass. 352, 361 (2022) (quoting Kauders, 486 Mass. at 574). Reasonable notice of a contract's terms exists when "the party had an adequate opportunity" to view the agreement, even if they did not do so. Kauders, 486 Mass. at 574. To determine whether reasonable notice has been given, courts must evaluate the "totality of the circumstances[.]" Id. at 573.

Hastings' settlement agreement is a valid contract. Hastings was given reasonable notice of all the terms. See [Dkt. No. 15, Exhibit C at § 1(a)-(c)] (stating that all parties to the settlement agreement have "consulted with an

"Plaintiffs' job title alone is not dispositive because '[i]t is not the title of the worker…

that is the key focus of the analysis but rather the actual activities performed.'" Canales, 569 F.

Supp. 3d at 268 (quoting Fraga, 583 F. Supp. 3d at 285).  Plaintiffs have each submitted a

supplemental affidavit in which they swear that they spend 50-60 hours per week performing

delivery services for Bimbo, "including driving delivery routes, loading vehicles, and

merchandising products at retail locations."  [Dkt. No. 18.1 at Exh. A ¶ 8, Exh. C ¶ 10].

Specifically, the work performed by Plaintiffs includes "transporting Bimbo's products in

vehicles from Bimbo's warehouse facilities to various retail locations including grocery stores,

supermarkets, and other food service establishments."  Id. at Exh. A ¶ 7, Exh. C ¶ 9.  Defendants

counter that only "contracts of employment," defined as "contracts 'for the performance of work

by workers[]'" fall within § 1's exception to the FAA.  [Dkt. No. 15, at p. 11-12, 15].  Defendants

maintain that the distribution agreements entered into by Hastings and Igwenagu are not

contracts for the performance of work by workers because they permit Plaintiffs to delegate their

obligations to their own employees and/or contractors, and, therefore, are more akin to

commercial agreements between businesses.  Id.

To the extent that Defendants argue that Plaintiffs cannot be exempt under 9 U.S.C. § 1

because the distribution agreements they signed define them as independent contractors and

disclaimed any employment relationship, this argument fails.  [Dkt. No. 15 at p. 1].  The

Supreme Court has interpreted Congress's use of the term "contract of employment" to "capture

any contract for the performance of *work* by *workers*[,]" including work done by independent

---

attorney before signing[,]… are acting voluntarily and of their own free will in signing this agreement [, and]
understand all provision and effects of this Agreement…").  Hastings assented to the settlement agreement by giving
his signature. [Dkt. No. 15, Exhibit C at 6]; see Kauders, 486 Mass.at 574-75 (stating that signatures are the most
traditional evidence of assent).  Since the settlement agreement is a valid contract, it is integrated into the original
distribution agreement.
　　　As this Court has already explained, the underlying Distribution Agreement is a contract "for the
performance of work by workers" under the definition of New Prime.  See New Prime, 586 U.S. at 116.

10

contractors.  New Prime, 586 U.S. at 114, 116.  Thus, this Court finds that the distribution agreements' classification of Plaintiffs as independent contractors does not foreclose their exempt status under § 1.

Defendants' argument that the distribution agreements and settlement agreement are evidence that Plaintiffs did not engage in transportation work because the agreements do not require Plaintiffs specifically to perform the transportation work is also unavailing.  Another court in this District rejected this same argument in Canales v. Lepage Bakeries Park Street LLC, pointing out that "although the Distributor Agreements do not require Plaintiffs to personally drive trucks or deliver goods, they also do not prohibit such activities."  596 F. Supp. 3d at 269. Plaintiffs claim that they spend 50-60 hours per week performing delivery services for Defendants.  [Dkt. No. 18.1 at Exh. A ¶ 8, Exh. C ¶ 10].  Further, Plaintiffs state that they spend their working hours engaged in transportation work, such as "transporting Bimbo's products… to various retail locations[,]" "loading vehicles, and merchandising products at retail locations." [Dkt. No. 18, Exh. C at ¶¶ 7-8]; [Dkt. No. 18, Exh. D at ¶¶ 7-8].

Defendants have not pointed to any binding case law that requires a worker to be transporting goods at all times in order to be considered a "transportation worker."  In fact, case law states the opposite: that a worker need not perform only transportation-related work to be deemed a "transportation worker."  See Canales, 596 F. Supp. 3d at 269 (citing cf. Saxon v. Southwest Airlines, Co., 993 F.3d 492, 494 (7th Cir. 2021) (noting that "[o]stensibly [plaintiff's] job is meant to be purely supervisory," but still finding that she was a transportation worker because her declaration stated that she would fill in as a ramp agent when the company was short on workers)).  The Supreme Court has clarified that a worker is a transportation worker if "the worker[] perform[s] [transportation] work frequently[.]"  Southwest Airlines Co. v. Saxon, 596

U.S. 450, 456-57 (2022) (finding that an employee who physically loaded and unloaded cargo "up to three shifts per week" performed that duty frequently enough to be classified as a transportation worker).  The District of Massachusetts has found that employees deemed "Merchandisers" who stocked product and built product displays from merchandise shipped from out of state performed work "'so closely related to interstate transportation as to be practically a part of it,' and therefore [are] covered by the FAA's exemption."  Fraga, 583 F. Supp. 3d at 281, 290 (internal quotations omitted).  This Court finds that 50-60 hours per week, 10-20 hours beyond what is commonly considered to a be full-time work week, is "frequent." See Canales, 596 F. Supp. 3d at 268 ("taking Plaintiffs' statements that they spend over fifty hours a week delivering goods as true, Plaintiffs' responsibilities are essentially identical to the Waithaka delivery drivers' responsibilities and, under that binding precedent, clearly fall within the § 1 exemption.").  Thus, it is clear that the functions performed by Plaintiffs fit within the § 1 exemption as it has been applied by this District.

2.   Plaintiffs were engaged in interstate commerce.

The next issue this Court must address is whether the transportation work performed by Plaintiffs constitutes "interstate commerce" as is also required for Plaintiffs to qualify as exempt under § 1.  See 9 U.S.C. § 1 (stating that the statute does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."); see also Canales, 596 F. Supp. 3d at 266.  Plaintiffs do not claim that they fall into the first category of interstate transportation workers who "themselves carried goods across state lines[,]" Fraga, 61 F.4th at 237; however, as noted, the First Circuit recognizes that a worker himself does not need to have carried goods across state lines to qualify as a transportation worker.  Id. (quoting Waithaka, 966 F.3d at 20).  Rather, workers "who transported goods or

12

passengers that were moving interstate[,]" and workers who were so closely related to interstate transportation, that they were "practically a part of it" can also qualify as transportation workers and therefore be exempt under § 1. Id. (quoting Waithaka, 966 F.3d at 20).

The First Circuit has found that last-mile delivery drivers are transportation workers engaged interstate commerce "regardless of whether the workers themselves cross state lines" because they work in "transporting goods or people 'within the flow of interstate commerce,'" Waithaka, 966 F.3d at 26. The District of Massachusetts found that workers who, like Plaintiffs, were also delivery drivers for a bakery, from which they purchased the distribution rights to deliver products and stock shelves along particular routes, were engaged in interstate commerce within the meaning of § 1. Canales, 596 F. Supp. 3d at 270. As in that case, here Defendants do not dispute that the baked goods transported by Plaintiffs crossed state lines before being delivered by Plaintiffs or involved interstate transactions. Id. at 269; [Dkt. No. 15 at pp. 11, 15] (stating that the settlement and distribution agreement respectively provided for interstate transactions and concerned the sale of baked goods which had been transported across state lines). In fact, Plaintiffs deliver goods through Defendants' interstate distribution network and perform the final stage of that interstate transportation process. See [Dkt. No. 1 at ¶ 8] (stating that Defendant's products are "distributed throughout Massachusetts and neighboring states"); see also [Dkt. No. 15.2 at ¶ 3] (Defendants declaration in support of motion stating that "[a]ll bakery products sold by Plaintiff Brandon Hastings and Cee Distribution LLC pursuant to the applicable Distribution Agreements are produced in states outside of Massachusetts and shipped to Massachusetts sales centers where Plaintiffs (or other individuals on their behalf) purchase and pick up the products they sell to their customers.").

This Court notes that not every worker who transports goods that have moved in interstate commerce will meet the requirements for § 1's exemption: "the section 1 exemption can apply to workers who are engaged in the interstate movement of goods 'even if they are responsible for only an intrastate leg of that movement,' but only if their work is 'a constituent part of that movement, as opposed to a part of an independent and contingent intrastate transaction.'" Immediato v. Postmates, Inc., 54 F.4th 67, 77 (1st Cir. 2022). In Immediato v. Postmates, the First Circuit refined its holding in Waithaka and found that plaintiffs who delivered take-out meals from local restaurants as well as comestibles and sundries from local grocery stores were not exempt under § 1 because although they transported goods, they did so as part of separate intrastate transactions that were not themselves within interstate commerce. Id. at 78. In McCatty v. Stallion Express, LLC, the District of Massachusetts noted that what distinguished the plaintiffs in Immediato from those who were deemed to be transportation workers engaged in interstate commerce in Waithaka was that, with regard to the Immediato plaintiffs, "Customers' purchases of…meals and goods from local businesses and the deliveries of those purchases were part of an entirely new and separate transaction…the interstate transport of the goods delivered by the [plaintiffs] had terminated when the goods arrived at local restaurants and grocery stores." 789 F. Supp. 3d 107, 117 (D. Mass. 2025) (quoting Immediato, 54 F.4th at 77-78)).

Here, however, Plaintiffs' transportation work is more akin to the last-mile Amazon drivers in Waithaka.[5] "[I]n in Waithaka, customers bought goods directly from Amazon, which

---

[5] Here, as in Immediato, the interstate supplier was paid for goods before the goods were later delivered by the Plaintiffs. See [Dkt. No. 15. 1, Exh. A at § 4.2]; [Dkt. No. 15.1, Exh. C at § 3.2]. The similarities stop there. As discussed in the motion to dismiss below, Defendants exercised considerable control over Plaintiffs, including designating the retailers to which they were to deliver baked goods, the promotion of Defendants' goods at such retailers, and the designation of distribution points at which plaintiffs were to pick up Defendants' goods. Accordingly, Plaintiffs' obligation to pay Defendants for its products at distribution points did not serve to break the continuity of interstate travel of Defendants' goods.

orchestrated the interstate movement of those goods and arranged, as part of the purchase for their delivery directly to the customer.  Hence, "[t]hat local delivery was [ ] integral to the interstate movement such that the goods remained within the flow of interstate commerce until arriving at the customer's doorstep."  Id. (quoting Immediato, 54 F.4th at 77-78).  Similarly, here there is no indication that consumers could purchase baked goods and pick them up directly from Defendants' Wilmington or Millbury, Massachusetts warehouses out of which Plaintiffs made their deliveries.  Thus, Plaintiffs' work was "integral to the interstate movement such that the goods remained within the flow of interstate commerce[,]" until the goods Plaintiffs transported arrived at a local store from which they could be purchased by consumers.  Id.; [Dkt. No. 15.1, Exh. A, § 1.1(b)] (Igwenagu's Distribution Agreement defining "Direct Store Delivery" as "the manner of sale of Products by the physical delivery of Products at the place where the Outlet sells Product to the public, including merchandising, or purchases Product for use and consumption at the Outlet."); [Dkt. No. 18.1, Exh. A at ¶¶ 7-8] (Hastings stating that his work primarily includes delivering baked goods to retail locations).

Because this Court concludes that arbitration should not be compelled as Plaintiffs' contracts containing the arbitration clauses at issue are contracts for employment of transportation workers involved an interstate commerce and are therefore exempt under § 1 of the FAA, it does not reach the question of whether arbitration could be compelled under Massachusetts state law.  See New Prime, 586 U.S. at 108 (stating that a court "should decide for itself whether § 1's 'contract of employment' exclusion applies before ordering arbitration.").

III.    MOTION TO DISMISS STANDARD

Under Rule 12(b)(6), a party can challenge a complaint on the grounds that it fails "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  To survive a Rule

12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." Duke v. Community Health Connections, Inc., 355 F.Supp.3d 49, 54 (D. Mass. 2019) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "In evaluating whether a plaintiff has met this burden, [the court] 'accept[s] the complaint's well-pleaded facts as true and indulge[s] all reasonable inferences in the plaintiff's favor.'" Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 33 (1st Cir. 2020) (quoting Cook v. Gates, 528 F.3d 42, 48 (1st Cir. 2008)). "When considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a court 'should not grant the motion unless it appears to a certainty that the plaintiff would be unable to recover under any set of facts.'" Theta Products, Inc. v. Zippo Mfg. Co., 81 F. Supp. 2d 346, 348 (D.R.I. 1999) (quoting Roma Constr. Co. v. aRusso, 96 F.3d 566, 569 (1st Cir. 1996)). Dismissal is appropriate where the complaint fails to include "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory[.]" Pitta v. Medieros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).

In addition to their motion to Compel Arbitration and Stay Proceedings, Defendants move in the alternative to dismiss Plaintiffs' Count III and Count IV for Failure to State a Claim pursuant 9 U.S.C. § 1 *et seq.* and Federal Rule of Civil Procedure 12(b)(6). [Dkt. No. 14 at p. 1]. Because this Court has denied the Defendants' Motion to Compel Arbitration and Stay Proceedings, it now addresses Defendants' Motion to Dismiss Counts III and IV.

16

### A. Count III

Plaintiffs bring Count III alleging that Defendants' failure to reimburse Plaintiffs for business expenses they incurred in the performance of work for Defendants constitutes an unfair reduction of wages under M.G.L. c. 149, § 148 and violates the corresponding Massachusetts Wage Act regulations requiring reimbursement for travel expenses during the workday.  [Dkt. No. 1 at ¶¶ 71-77].  To state a claim under the Massachusetts Wage Act, a plaintiff must allege that "(1) he was an employee under the statute, (2) his form of compensation constitutes a wage under the statute, and (3) the defendants violated the Act by not paying his wages in a timely manner."  Klauber v. VMware, Inc., 599 F. Supp. 3d 34, 46 (D. Mass. 2022), aff'd, 80 F.4th 1 (1st Cir. 2023).

> 1. Plaintiffs plausibly allege that they are "employees" under the Massachusetts Wage Act.

Plaintiff's Complaint adequately sets out the first element of Count III, that Plaintiffs allege that they were "employees" under the Massachusetts Wage Act.  First, the Complaint alleges that "Defendants misclassified [Plaintiffs] and other delivery drivers as independent contractors when they were, in fact, statutory employees under Massachusetts law."  [Dkt. No. 1 at ¶ 1].  Under Massachusetts law, workers are presumed to be employees unless:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
> (2) the service is performed outside the usual course of the business of the employer; and,
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. c. 149, § 148B.    It is the employer's burden to rebut this presumption of employment. Chambers v. RDI Logistics, Inc., 476 Mass. 95, 100 (2016).  A plaintiff need only show that one

17

prong of the test is not met by Defendants to prevail on the presumption that he or she is an employee. Ouadani v. Dynamex Operations East, LLC, 405 F. Supp. 3d 149, 165 (D. Mass. 2019).

Plaintiffs point to a Massachusetts Board of Review's opinion affirming a finding by the Massachusetts Division of Unemployment Assistance that another bakery's distributor was in fact an employee under the applicable test on similar facts. See BR-108261-XA, MA Board of Review (Mar. 10, 2010).[6] Plaintiffs have also supplied the Court with citations to a New York state case employing a test which, albeit not identical, is similar to the test employed in Massachusetts for determining whether a plaintiff is an employee under the Massachusetts Wage Act, which found that Bimbo's delivery drivers classified as independent contractors are in fact employees. Id. at ¶ 2 (citing Appeal No. 607476, N.Y. Unemployment Ins. Appeal Bd. (Oct. 15, 2020) and Matter of Claim of Cowan, 159 A.D.3d 1312, 1314, 73 N.Y.S.3d 653, 655 (2018) (affirming administrative board holding that Bimbo "exercised sufficient supervision, direction and control over claimant to establish an employer-employee relationship under common-law principles.")).

Beyond the Massachusetts Wage Act presumption, Plaintiffs plausibly raise allegations sufficient to challenge any argument Defendants may advance against Plaintiffs' status as employees that Plaintiffs were (1) free from control and direction in connection with the performance of the service, (2) performed service outside the usual course of business, and (3) customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed. M.G.L. c. 149, § 148B(a).

---

[6] Available at https://uiappeals.ny.gov/system/files/documents/2020/11/607476-appeal-decision.pdf.

With respect to the being free from control, Plaintiffs allege that "Defendants exercise[d] virtually unlimited control over Plaintiffs[.]" [Dkt. No. 1 at ¶ 29]. Specifically, Plaintiffs claim that

> Defendants dictate all pricing of the products Plaintiffs deliver. Bimbo requires Plaintiffs and [independent distributors] to deliver products that are not profitable (and to stores that are not profitable). Bimbo employs supervisors who monitor their work including by traveling to the stores they deliver to evaluate their merchandising of Bimbo's products (consistent with Bimbo's written policies and merchandising "planograms") and discipline delivery drivers both in writing and orally for failing to adhere to Bimbo's policies and standards (including threatening to terminate [those] whose work does not satisfy Bimbo's standards).

Id. Plaintiffs further state that Defendants have forced them to change the warehouses from which Plaintiffs take deliveries without any input from Plaintiffs, often resulting in longer commutes and thus additional hours worked without compensation. Id. at ¶ 30. In addition to the practical control that Plaintiffs allege Defendants assert over their work, Plaintiffs point out that the Distribution Agreements signed by Plaintiffs also specifically reserves substantial control for Defendants. Id. at ¶ 31. As to the second requirement for overcoming the presumption that workers are employees, that they perform outside of the usual course of business, Plaintiffs' complaint states in multiple places that they performed the same work as delivery drivers who were classified by Defendants as employees. [Dkt. No. 1 at ¶ 27]. Lastly, there is no indication that either Plaintiff is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed. See [Dkt. Nos. 1, 15].

Further, Plaintiffs have alleged that "Defendants admittedly employ other workers who perform the same or substantially similar delivery duties as Plaintiffs but classify them as employees rather than independent contractors. These properly classified employees work out of

19

the same warehouse facilities as other misclassified workers in Massachusetts." [Dkt. No. at ¶

21] (emphasis omitted).  They also assert that

> There are no meaningful differences between the job duties, qualifications, or responsibilities of Defendants' properly classified employee drivers and the misclassified "independent contractor" drivers. Both groups of drivers: a) Deliver the Bimbo's bakery products; b) Use the same or similar facilities for loading their vehicles; c) Deliver to the same or similar retail customer locations; d) Follow the same core delivery protocols; e) Use the same or similar tracking and reporting systems; f) Are subject to discipline from Bimbo's managers; and g) Are subject to the same or similar quality control standards.

[Dkt. No. 1 at ¶ 27].

Though Defendants assert in conclusory terms that Plaintiffs will not be able to establish

that they are employees, [Dkt. No. 15 at pp. 12-13], nowhere in their Motion to Dismiss do they

put forward any arguments to rebut the presumption that workers are employees under M.G.L. c.

149, § 148B.  Accordingly, I conclude that Plaintiffs have plausibly alleged that they are

employees under the statute.

2.  Plaintiffs plausibly allege that their form of compensation constitutes "wages" and that Defendants violated the Massachusetts Wage Act by failing to reimburse them.

Plaintiffs and Defendants cite conflicting caselaw with regards to whether

uncompensated expenses can be considered "wages" under the Massachusetts Wage Act.  [Dkt.

No. 15 at pp. 13-18]; [Dkt. No. 18 at pp. 16-19].

Plaintiffs cite M.G.L. c. 149, § 148, which states that employers cannot exempt

themselves from the requirements of the section "by a special contract with an employee or by

any other means."  [Dkt. No. 18 at p. 17] (citing M.G.L. c. 149, § 148).  Plaintiffs assert that this

section prohibits employers from "effectively reducing wages by shifting ordinary business costs

to the employee."  Id. (citing Garcia v. Right at Home, Inc., 2016 WL 3144372, at *4 (Mass.

Super. Ct. Suffolk County Jan. 19, 2016)).  Accordingly, "[a]n agreement to circumvent the Wage

Act is illegal even when 'the arrangement is voluntary and assented to.'" Melia v. Zenhire, Inc., 462 Mass. 164, 170 (2012).  Courts in this District have held that "[r]equiring employees to front employee expenses, including travel expenses, can constitute wage reductions under the Wage Act." Serebrennikov v. Proxet Group LLC, 2024 WL 1376971, at *5 (D. Mass. Mar. 29, 2024). "This is because the Wage Act bars wage reduction 'by any other means,' and a company requiring the plaintiff to "travel many miles using his own vehicle while working on behalf of [the company]' reduces his wages 'just as effectively as if the employer had ... deducted funds from [his] wages.'" Id. (quoting Furtado v. Republic Parking System, LLC, 2020 WL 996849, at *5 (D. Mass. Mar. 2, 2020)); see also Fraelick v. PerkettPR, Inc., 83 Mass. App. Ct. 698, 707-08 (2013).  Plaintiffs allege that they "incurred business expenses, including, but not limited to, fuel costs, vehicle maintenance and repair expenses, and tolls and similar transportation fees" and that "[t]hese expenses were incurred primarily for Defendants' benefit and as a necessary part of the job duties of Plaintiffs and the Class members." [Dkt. No. 1 at ¶¶ 73-74].  Plaintiffs' allegedly unreimbursed expenses are nearly identical to those that this District found constituted an impermissible deduction in wages in Serebrennikov.  See id.; Serebrennikov, 2024 WL 1376971, at *5.

Plaintiffs also cite DaSilva v. Border Transfer of MA, Inc., in which defendant's argument, similar to that advanced by Bimbo, that "even if class members were misclassified as independent contractors, they cannot recover some or all of the deductions and expenses they seek as a matter of law" because "drivers agreed in their [contracts] to bear the expenses they now seek to recover[,]" was rejected by this Court.  377 F. Supp. 3d 74, 87-89 (D. Mass. 2019). Specifically, the DaSilva court clarified that plaintiffs' consent to various deductions in their contracts "is no defense to Defendants' Wage Act liability." Id. at 88; see also Awuah v. Coverall

21

North America, Inc., 460 Mass. 484, 498 (2011) (holding that the concept that "[a] contract term that violates public policy is not entitled to be enforced" applies to attempts by employers to contract around the Wage Act to make deductions from employees' wages).

Defendants counter that Plaintiffs' claims "suffer[] a fatal defect—[they] presumes [sic] that business expenses constitute wages under the Wage Act when no binding or persuasive authority supports this presumption." [Dkt. No. 15 at p. 13] (citing Waithaka v. Amazon, Inc., 2024 WL 5263739, at *4 (W.D. Wash. Dec. 31, 2024)).  Defendants' also cite Klauber v. VMWare, Inc., for the proposition that expense reimbursements do not constitute "wages" under the Wage Act and therefore Plaintiffs cannot state a claim for relief.  Id. (citing Klauber, 599 F. Supp. 3d 34, 46 (D. Mass. 2022)).  Defendants also raise that "[n]othing in the text of the Wage Act requires employers to provide expense reimbursement; indeed, the statute does not discuss expenses at all."  Id. (citing M.G.L. c. 149, § 148).  Further, they claim that the statute "simply requires the payment of "wages earned."  Id.  While M.G.L. c. 149, § 148 does not define "wages," Defendants maintain that "it is clear that '[n]ot all remuneration that an employer provides its employees is a 'wage.'"  Id. at 14 (quoting Birnbach v. Antenna Software, Inc., 2014 WL 2945869, at *4 (D. Mass. June 26, 2014)).  Specifically, Defendants argue that "business expenses are not 'earned' through 'labor or service,' and therefore fall outside the plain language of the Wage Act."  Id. (citing Fraelick, 83 Mass. App. Ct. at 706).  Accordingly, Defendants contend, this is why courts have "rejected Wage Act claims based on failure to provide expense reimbursement."  Id. at (citing Waithaka, 2024 5263739, at *4; Awuah v. Coverall N. Am., Inc., 740 F. Supp. 2d 240, 243 (D. Mass. 2010); and Driscoll v. Worcester Tel. & Gazette Corp., 2009 WL 3839067, at * 2 (Mass. Super. Ct. Sept. 28, 2009)).

While some of the case law cited by Defendants suggests that an employer's failure to pay expense reimbursements is not actionable under the Massachusetts Wage Act, an examination of the cases cited by both parties reveals that Plaintiffs' allegations, taken as true and viewed in the light most favorable to Plaintiffs, Borrás-Borrero, 958 F.3d at 33, are sufficient to assert a plausible claim for relief, which is all that is needed for Plaintiffs' to overcome Defendants' motion to dismiss.  Duke, 355 F. Supp. 3d at 54 (quoting Twombly, 550 U.S. at 559).  Starting with Defendants' claim that expense reimbursements do not constitute "wages" under the Wage Act and therefore Plaintiffs cannot state a claim for relief, [Dkt. No. 15 at p. 13) (citing Klauber, 599 F. Supp. 3d 34, 46 (D. Mass. 2022)), the Klauber case which Defendants cite for this proposition does not discuss whether expense reimbursements are wages (or even mention expense reimbursements), but rather concludes only that "commissions" not yet earned by an employee are not wages under the terms of the Wage Act.  Though Defendants are correct that not all remuneration constitutes a "wage" under the Act, see Birnbach, 2014 WL 2945869, at *4, and therefore "[i]n the ordinary course, the violation of a standard expense reimbursement arrangement would not constitute a violation of the Wage Act because the reimbursement is not compensation 'earned' by 'labor, service or performance,'" Fraelick, 83 Mass. App. Ct. at 706, Defendants ignore the fact that the Fraelick court found that, a "pattern of nonpayment" of expenses could rise to the level of violating the SJC's holding in Awuah, which held that employers cannot enter into "special contracts" which exempt them from complying with the Wage Act by shifting costs to employees.  See id. at 706-07 ("The Wage Act prohibits an employer from exempting itself from the timely and complete payment of wages by "special contract ... or by *any other means*.").  The SJC specifically noted in Awuah that

> [a]n agreement between an employer and an employee that the employee will obtain insurance for the benefit of the employer also violates the Wage Act because

23

it is a "special contract" that has the effect of exempting the employer from the obligations to pay earned wages in full. See § 148. Cf. 29 C.F.R. § 531.35 (2010) (under Federal Fair Labor Standards Act of 1938, " 'wages' cannot be considered to have been paid ... unless they are paid finally and unconditionally or 'free and clear,' [and not] 'kick[ed]-back' ... to another person for the employer's benefit").

Thus, this Court concludes that, even if Plaintiffs cannot show that unpaid expense reimbursements constitute "wages" under the Wage Act, they may argue that terms of their distribution agreements constitute a "special contract" allowing Defendants' to circumvent § 148's requirement that wages be paid in full.

Because courts in this District have held that "[r]equiring employees to front employee expenses, including travel expenses, can constitute wage reductions under the Wage Act," Serebrennikov, 2024 WL 1376971, at * 5, and Plaintiffs have raised sufficient facts to suggest that they should be considered employees under the Wage Act, I recommend that this Court deny Defendants' motion to dismiss Count III.

### B. Count IV

#### 1. Elements of a Claim for Unjust Enrichment

Plaintiffs bring Count IV for unjust enrichment, alleging that Plaintiffs conferred a benefit upon Defendants by working as delivery drivers and incurring business expenses on Defendants' behalf which Defendants have a legal obligation to repay under Massachusetts law. [Dkt. No. 1 at ¶¶ 78-82]. "Under Massachusetts law, a plaintiff may recover for unjust enrichment upon a showing that 1) plaintiff conferred a benefit upon the defendant, 2) the defendant accepted that benefit and 3) the defendant's retention of the benefit would be inequitable without payment for its value." Malaro v. Roger Wilkie, Jr. Builder, Inc., 675 F. Supp. 3d 129, 131 (D. Mass. 2023) (citing Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009)); see also Mass. Eye & Ear Infirmary v. QLT

24

Phototherapeutics, Inc., 412 F.3d 215, 234, n. 7 (1st Cir. 2005) (stating that the elements of an unjust enrichment claim are "unjust enrichment of one party and unjust detriment to the other party.") (internal quotations omitted).

However, "a party with an adequate remedy at law cannot claim unjust enrichment." Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017). "Litigants are therefore not permitted 'to override an express contract by arguing unjust enrichment.'" Malaro, 675 F. Supp. 3d at 131-32 (quoting Shaulis, 865 F.3d at 16)); see also Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 641 (2013) ("Ordinarily, a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties.") (internal quotations omitted); Harrison v. Massachusetts Bay Transportation Authority, 2020 WL 4347511, at *1 (finding that "unjust enrichment count fails to state a claim upon which relief can be granted because the parties' rights and obligations were defined by valid contracts."). Notably, it is the "availability of a remedy at law, not the viability of that remedy" which prohibits a claim of unjust enrichment. Id. (quoting Shaulis, 865 F.3d at 16)).

While the existence of a contract defining the obligations of the parties ordinarily defeats a claim for unjust enrichment, Massachusetts Courts recognize that "the existence of a contract is a question of fact." Chang v. Winklevoss, 95 Mass. App. Ct. 202, 211 (2019) (citing LeMaitre v. Mass. Turnpike Auth., 70 Mass. App. Ct. 634, 637 (2007)). At the pleadings stage where the factual question of contract validity has not yet been resolved, it is error to dismiss an unjust enrichment claim because to do so would "presuppose the existence of a valid underlying contract." Id. (citing Zelby Holdings, Inc. v. Videogenix, Inc., 92 Mass. App. Ct. 86, 93 (2017)).

2.  Application

As a threshold matter, I find that Plaintiffs have adequately pled the elements of an unjust enrichment claim.  See Malaro, 675 F. Supp. 3d at 131.  The Complaint alleges that 1) Plaintiffs conferred a benefit on Defendants by working as delivery drivers for Bimbo, see [Dkt. No. 15 at ¶¶ 6-7], 2) Defendants accepted that benefit by using Plaintiffs' delivery services, id. at ¶¶ 6-7, 16, and 3) Defendnats retention of the benefit would be inequitable without payment for its value because they allege that Defendants misclassified them as independent contractors when they should have been properly classified as employees, a classification that would have entitled them to various benefits which they never received.  Id. at ¶¶ 17-18, 21, 24 (alleging that "Bimbo's properly classified employees receive employment benefits that were denied to Plaintiffs and other misclassified drivers, including, but not limited to, health insurance, retirement benefits, paid time off, workers' compensation coverage, unemployment insurance, and reimbursement for business expenses.").

Defendants, however, rightly point out that Plaintiffs' distribution agreements cover the terms of their compensation and in fact "expressly ***disclaim[]*** the very rights and benefits Plaintiffs now seek."  [Dkt. No. 15 at p. 20] (emphasis in original) (citing [Dkt. No. 15, Exh. A at § 2.2; Exh. B at § 2.3])).  Thus, Defendants maintain, Plaintiffs' unjust enrichment claim must be dismissed consistent with case law which states that "ordinarily, a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties." Metropolitan Life Ins., 464 Mass. at 641.

Plaintiffs counter Defendants' argument that the existence of the distribution agreements precludes their unjust enrichment claim by arguing that their Complaint calls the validity of the underlying distribution agreements into question.  [Dkt. No. 18 at pp. 19-20].  Specifically,

26

Plaintiffs state that they have "adequately alleged that Bimbo knowingly evaded Massachusetts law by perpetuating its misclassification scheme despite legal opinions finding that similar employers cannot satisfy the independent contractor burden."  Id. at 20 (citing [Dkt. No. 1 at ¶¶ 2-3]).  I agree that Plaintiffs' Complaint calls into question the legitimacy of the underlying distribution agreements, [Dkt. No. 18 at p. 19].  If Plaintiffs prevail on their claim for relief that they were misclassified as independent contractors and were actually employees of Defendants under Massachusetts Wage Act, see [Dkt. No. 1 at p. 16], contract provisions contained in their distribution agreements which violate the Wage Act will no longer be entitled to enforcement. See Awuah, 460 Mass. at 498 (citing Warfield v. Beth Israel Deaconess Med. Ctr. Inc., 454 Mass. 390, 397-98 (2009) ("A contract term that violates public policy is not entitled to be enforced.")). Accordingly,  it would be error to dismiss Plaintiffs' claim for unjust enrichment on the grounds proposed by Defendants that contractual provisions cover the terms of their compensation where the validity of that contract has not yet been established.  See LeMaitre, 70 Mass. App. Ct. at 637.

Thus, I recommend that Defendants' motion to dismiss Count IV be denied.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel Arbitration and Stay Proceedings is denied, and I recommend that Defendants' Motion to Dismiss Counts III and IV be denied as well.

Ordered.

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge